**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. _____**

ALLIANCE CONSTRUCTION SOLUTIONS, LLC

      Plaintiff,

v.

WESTCHESTER FIRE INSURANCE COMPANY

      Defendant.

---

## COMPLAINT

---

     Plaintiff Alliance Construction Solutions, LLC ("ACS" or "Plaintiff"), for its Complaint against Westchester Fire Insurance Company ("Westchester," "Surety" or "Defendant"), states as follows:

## I.      PARTIES, JURISDICTION AND VENUE

     1.      Westchester is an insurance company authorized to do business in Colorado. Westchester is incorporated under the laws of the State of New York and has its principal place of business at 436 Walnut Street, Philadelphia, PA 19106.  Westchester is a citizen of New York and Pennsylvania pursuant to 28 U.S.C. § 1332(c)(1).

     2.      ACS is a limited liability company organized under the laws of Colorado and has its principal place of business at 12789 Emerson Street, Thornton, CO 80241.

     3.      The members of ACS are all residents of the State of Colorado.

     4.      ACS is a citizen of the State of Colorado.

5.      No member of ACS is a citizen of the same state as Westchester.   Therefore complete diversity of citizenship exists between the parties.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because ACS's claims against Westchester: (a) are between and among citizens of different states; and (b) involve an amount in controversy exceeding $75,000.

7.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to ACS's claims against Westchester occurred in the State of Colorado and Westchester's Subcontractor Performance Bond (the "Bond") insured risks located in the State of Colorado.

## GENERAL ALLEGATIONS

**ACS, JDE, and the St. Francis Apartments at Cathedral Square.**

8.      ACS is a general contractor.

9.      ACS was hired to build a an apartment complex adjacent to the St. John's Cathedral in downtown Denver called the St. Francis Apartments at Cathedral Square (the "Project").

10.      The Project was built to provide housing to formerly homeless families.

11.      ACS subcontracted the electrical and low voltage scopes of work on the Project to JDE, Inc. ("JDE").   ACS's contract with JDE (the "JDE Subcontract") was comprised of a Multi-Project Subcontract dated September 7, 2016 (the "JDE MPS") and a Work Authorization for Multi-Project Subcontract dated September 20, 2016 (the "JDE SWA").   JDE's scope of work under the JDE Subcontract shall be referred to herein as the "Work."

12.     The JDE Subcontract required JDE to provide a performance bond to insure JDE's completion of its Work on the Project.

13.     JDE obtained the performance bond required by the JDE Subcontract from Westchester.  A copy of Westchester's Subcontractor Performance Bond No. K09534398 (the "Bond") is attached hereto as Exhibit 1.

**Relevant Requirements of the Bond and JDE Subcontract.**

14.     The scope of the Surety's obligation under the Bond is defined in Paragraph 1 of the same:

> **Scope of Bond.**  [JDE][1] and Surety, jointly and severally; bind themselves, and their respective heirs, administrators, executors, successors and assigns, to [ACS] for the performance of the [JDE SWA], which is incorporated in this bond by reference.  The Surety's total obligation shall not exceed the Penal Sum of this Bond.

15.     The Bond incorporated the JDE SWA which, in turn, incorporated the JDE MPS.

16.     The Bond's incorporation by reference of the JDE SWA is an incorporation by reference of the entire JDE Subcontract.  The first page of the JDE SWA specifically provides that "[a]ll terms and conditions of the [JDE MPS] apply to the work performed under this [JDE SWA]."

17.     Put simply, the Bond obligated the Surety to perform the JDE Subcontract in the event of JDE's default.

---

[1] The Bond and JDE Subcontract are replete with defined terms such as Obligee, Principal, Contractor, Subcontractor, etc. In an effort to eliminate legalese, such terms shall be replaced with the actual names of the parties herein. Where the replacements appear in language quoted from a relevant contract, ACS will use brackets [like these] to designate such changes.

18.     The Surety's obligations under the Bond are limited only by the penal sum of the Bond and the terms of the Bond and the JDE Subcontract incorporated therein.

19.     The original penal sum of the Bond was $784,303.

20.     The JDE Subcontract specifically states that "Payment and Performance Bonds executed by a surety company acceptable to Contractor shall be required for the full amount of each Work Authorization Form, **including modifications increasing the total amount of such Work Authorization Form**."  JDE MPS at Paragraph 11 (emphasis added).

21.     The total value of the JDE Subcontract is $857,226.  Therefore, the penal sum of the Bond should also be $857,226, either because JDE increased such sum as required by the JDE Subcontract prior to its default under the same, or because Westchester was required to increase the penal sum to that amount by the terms of the Bond and JDE Subcontract after JDE's default under the same.

22.     Paragraph 4 of the Bond provides that, in the event of a default in performance by JDE under the JDE Subcontract, the Surety may either: (1) pay the cost of completing the Work as it is completed (i.e., progress payments); (2) pay ACS the total sum for which Surety is liable under the Bond (useful when it is clear that performance costs will exceed the Penal Sum of the Bond); or, (3) deny liability (which requires the Surety to notify and explain to ACS the reasons it believes it has no liability).  Specifically, the operative language of Paragraph 4 is as follows:

> **4. Principal Default.**  Whenever [JDE] shall be, and is declared by [ACS] to be, in default under the [JDE Subcontract], with [ACS] having performed its obligations in the [JDE Subcontract],[2] the Surety shall promptly:
>
> …

---

[2] No party has alleged in this proceeding that ACS has in any way failed to perform any of its obligations under the JDE Subcontract.

**b. Pay the Balance to Complete the Subcontract Work.** The Surety will make available as the work progresses sufficient funds to pay the cost of completion less the balance of the [JDE Subcontract] price. The cost of completion includes responsibilities of [JDE] for correction of defective work and completion of the [JDE Subcontract]; [ACS's] cost resulting directly from [JDE's] failure to perform; [ACS's] legal and design professional cost resulting directly from [JDE's] default, and; liquidated damages or actual damages if no liquidated damages are specified in the [JDE Subcontract]. The term "balance of contract price" as used in this paragraph shall mean the total amount payable by [ACS] to [JDE] under the [JDE Subcontract] and any amendments to it, less the amount properly paid by [ACS] to [JDE]; or

**c. Pay Obligee.** Determine the amount for which it is liable to [ACS] and pay [ACS] that amount as soon as practicable; or,

**d. Deny Liability.** Deny its liability in whole or part and notify and explain to [ACS] the reasons why the Surety believes it does not have responsibility for this liability.

23. The language of the Bond cannot be read in isolation. Instead, it must be read in conjunction with the language of the JDE Subcontract, which the Surety bound itself to perform and which is expressly incorporated into the language of the Bond by reference. Relevant provisions of the JDE Subcontract include:

i.   Section 3 of the JDE MPS:

[The JDE SWA] is hereby deemed to include all service, supervision, materials, tools, scaffolding, labor, equipment, hoisting, uncrating, setting, installation, parking, protection, shop drawings, submittals, samples, mock-ups, Operations and Maintenance Manuals, As-Build Record Documents, Warranties, and any other items as may be required to assure a complete and acceptable installation under [the JDE SWA].

ii.  Section 4 of the JDE MPS:

If [JDE] fails to complete its work within the elapsed time specified on [the JDE SWA], according to the construction schedule, as it may be modified from time to time, [JDE] shall pay to [ACS], all damages and costs incurred in accordance with Section 6, Paragraph 18 herein for any delay in the completion of the work designated on [the JDE SWA].

iii.   Section 6, Paragraph 4 of the JDE MPS, requiring payment applications "covering the value of the work completed on [the JDE SWA] to the satisfaction of the [Project Owner and ACS] during that month."   The only supporting documentation explicitly required in Section 6, Paragraph 4 is lien waivers.

iv.   Section 6, Paragraph 8 of the JDE MPS:

[JDE] agrees to indemnify and hold harmless each [Project Owner] and [ACS] against all costs or claims for transportation, freight and express, for labor, materials, and equipment to and/or from the job, attorney's fees and litigation or arbitration costs and expenses, and for all other incidental expenses in connection with the performance of, or any deficiencies and/or delays in, [JDE's] work, and to prepay the transportation charges on all materials, etc., shipped for [the JDE SWA].

v.   Section 6, Paragraph 11 of the JDE MPS, providing that JDE (and, by operation of the Bond, Surety) shall pay ACS's losses related to the damage to work of other trades caused by the need to rectify JDE's non-conforming work on the Project:

To the fullest extent permitted by law . . .  [JDE] shall defend, indemnify and hold harmless the [Project Owner], [ACS], . . . and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the [JDE's] Work under this [JDE Subcontract], provided that any such claim, damage, loss or expense is attributable to . . . injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of [JDE, JDE's] Sub-subcontractors, or anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expenses is caused in part by a party indemnified hereunder.

vi.   Section 6, Paragraph 18 of the JDE MPS,[3] setting forth JDE's (and, by operation of the Bond, Surety's) obligation to pay all costs, expenses and losses resulting from JDE's failure to fully or timely perform its obligations under the JDE Subcontract:

18.   [JDE] agrees to prosecute [JDE's] work and the several parts thereof at such times and in such order as [ACS] considers necessary to keep the same on schedule and the work completed sufficiently in advance

---

[3] Section 6, Paragraph 18 of the JDE MPS is reinforced by paragraph 82 (under Project Standard Paragraphs) of the JDE SWA.

of the other parts of the [Project], and to avoid any delay in the completion of the construction of [the Project] as a whole.  In the event of (a) [JDE's] failure to deliver any and all materials and/or supply labor, furnish equipment or services, etc., as required on [the JDE SWA], and/or (b) [JDE's] failure to properly perform work, in keeping with the progress of the general construction work of [the Project], and/or (c) to properly perform any term, covenant, or condition contained in [the JDE Subcontract], and/or (d) any delay of any kind on [the Project], caused in whole or in part by [JDE, JDE] shall reimburse [ACS] for any loss or damage it incurs, including but not restricted to:

    a.   Liquidated damages assessed by the [Project Owner], under any General Contract for [the JDE SWA]; and

    b.   All additional expenses and damages incurred by [ACS] as a result, in whole or in part, due to the delay including, without limitation:

        a.   Extended general conditions/field office overhead during the period of delay.

        b.   Additional time incurred by [ACS's] personnel assigned, in whole or in part, to the [Project], whether or not salaried and whether or not managerial, as a result of delays caused, in whole or in part, by [JDE].  It is expressly understood that, in some circumstances, the use of [ACS's] own employees may reduce the overall cost of the supplementation or completion costs.  The amount of such time shall be determined by the amount of the person's base salary or wages (on an annual basis), increased by 33% to account for fringe benefits and other employee related costs, divided by 1,800 hours, and multiplied by the number of additional hours worked by each such person in supplementing or completing [JDE's] work.

        c.   Unabsorbed home office overhead.

        d.   Extra expense paid or incurred by [ACS] which is due to (a) [JDE's] failure to deliver any and all materials and/or supply labor, furnish equipment or services, etc., as required on each [the JDE SWA], and/or (b) [JDE's] failure to properly perform any and all work, in keeping with the progress of the general construction work of [the Project], and/or (c) to properly perform any term, covenant, or condition contained in [the JDE Subcontract], and/or (d) any delay of any kind on [the Project], caused in whole or in part by [JDE].

c. If, in [ACS's] opinion, [JDE] fails or refuses to proceed with its work on [the JDE SWA] as directed by [ACS], or fails to perform said work materially in accordance herewith, in whole or in part, or fails to materially perform any term, covenant, or condition contained in [the JDE Subcontract], [ACS] may, at [ACS's] option, upon seventy-two (72) hour written notice to [JDE's] last known email address or fax number (deemed received upon sending), take the following steps:

    a. Take any steps [ACS] deems necessary to supplement [JDE's] labor and/or materials, equipment, services, etc., for [the Project], and may take over all, or a portion of, [JDE's] equipment, materials, etc. and prosecute the work to completion on [the JDE SWA].  In case [ACS] deems the foregoing procedure necessary, all moneys expended and all of the losses, damages and extra expenses, including, but not limited to, [ACS] overhead, home office personnel, [ACS] fees, bond and insurance, any [Project Owner's] liquidated damages, [ACS's] personnel assigned, in whole or in part, to the [Project] (calculated as set forth above), costs incurred by other subcontractors to [ACS], and legal fees, expenses and costs (regardless if an arbitration or court proceeding is initiated) shall be paid by [JDE] to [ACS] deducted from the [JDE SWA] prices(s).  If such expenditures, together with said losses, damages and extra expenses or liquidated damages exceed the amount otherwise due to [JDE] thereunder, [JDE] agrees to pay [ACS], on demand, the full amount of such excess, together with interest thereon at the rate of eighteen percent (18%) per annum, compounded annually, until paid.

    b. Terminate the [JDE Subcontract] for default and contract with a replacement subcontractor to perform all, or a part of, [JDE's] work, perform the work itself, or a combination of the two.

    c. Both supplement and terminate the work, as [ACS] shall determine in its reasonable discretion.

vii. Section 6, Paragraph 19 of the JDE MPS, setting forth JDE's (and, by operation of the Bond, Surety's) obligation to make good all defective work:

19.    [JDE] shall promptly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of [ACS], any [Project Owner] under [the JDE SWA], and/or Architect under

[the JDE SWA] hereunder, and their authorized representatives. Should [JDE] refuse or neglect to proceed at once with the correction of rejected or defective materials and/or workmanship after receiving notice to do so, it is agreed that [ACS] shall have the right and power to have the defects remedied or changes made at the expenses of [JDE], and [JDE] agrees to pay [ACS], on demand, any and all loss and/or expense paid or incurred by [ACS] in remedying such defects and/or making such changes, together with interest thereon at the rate of eighteen percent (18%) per annum, compounded annually, until paid, in addition to all other loss, damage and extra expenses for which [JDE] may become liable under this [JDE Subcontract].

24.    The above-cited provisions of the JDE MPS are supplemented by the provisions of the JDE SWA applicable to the Project.  Specific inclusions to JDE's scope of work under the JDE SWA include (without limitation):

i.    All labor, materials, equipment and facilities necessary to provide complete and operating electrical systems at the Project pursuant to the Contract Documents (and specifically, Divisions 1 and 26 therein);
ii.    Furnish and install a design/build fire alarm system;
iii.    Electrical devices and trim;
iv.    Connection of mechanical, VTAC, PTAC, elevator, exterior signage and other necessary equipment;
v.    Fire caulking;
vi.    Coordination of electrical requirements of equipment installed by others;
vii.    Coordination of installation of fire alarm service at elevator cab with elevator subcontractor;
viii.    Electrical hook-up of all equipment included with JDE's scope; and,
ix.    Coordination of electrical installation at casework (i.e., electrified locksets, etc.).

25.    With respect to schedule, the JDE SWA specifically states that:

i.    JDE shall provide crews as necessary to complete the work in accordance with the contract schedule.  Multiple crews may be necessary to work in several areas and floors at the same time.
ii.    The project schedule, as prepared by ACS, must be maintained.

26.    With respect to quality control, the JDE SWA provides:

i.    Any costs associated with the correction and retesting of failed tests will be paid for by JDE and will be completed without impact to the construction schedule or other trades.

    ii.    JDE is responsible for any damage or destruction by JDE to the work of ACS and other trades.  Repair and replacement is at JDE's expense.

    iii.   JDE is responsible for all repair costs due to imperfections or failure to comply with plans and specifications.

    iv.   Defective, rejected, or out of tolerance installations by JDE will be repaired or removed at JDE's expense without impact on the construction schedule.

    v.    Cost of cutting and patching for work under JDE's scope is the responsibility of JDE.

27. Importantly, because the Bond binds the Surety to fully perform the JDE Subcontract, each and every obligation of JDE set forth above (and in the JDE Subcontract) became an obligation of the Surety upon JDE's undisputed default and failure to perform under the JDE Subcontract.

**Westchester's obligations under controlling law.**

28. The Surety's obligations under the Bond are not just defined by the Bond and the JDE Subcontract.  Because the Bond is an insurance contract, the Surety also has all the obligations inuring to an insurer under Colorado law.  These include, without limitation:

    i.    The Surety is required to read the Bond (which incorporates the JDE Subcontract) as a whole as an ordinary insured/obligee would understand it and not view clauses or phrases in isolation.

    ii.    The Surety must honor ACS's reasonable expectations by asking itself if a reasonable person would believe that he or she was entitled to payment based on the language of the Bond (and the JDE Subcontract incorporated therein).

    iii.   The Surety must interpret the language of the Bond (and the JDE Subcontract incorporated therein) according to the plain and ordinary meaning and interpretation of its words.

    iv.   If the Bond (and the JDE Subcontract incorporated therein) is at all unclear—i.e., if it may reasonably be interpreted in more than one fashion—the Surety must adopt the interpretation of the Bond most favorable to ACS.

    v.    The Surety may not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of ACS under the Bond (and the JDE Subcontract incorporated therein).  The Surety engages in "unreasonable conduct" when it

fails to do something that a reasonable surety would do, or does something that a reasonable surety would not do, under the same or similar circumstances, to protect ACS from injuries, damages, or loses covered by the Bond.  The Surety takes an "unreasonable position" when it takes a position with respect to ACS's claim under the Bond that a reasonable Surety would not take under the same or similar circumstances.

vi.   The Surety must acknowledge and act reasonably promptly upon communications with respect to ACS's claim under the Bond (and the JDE Subcontract incorporated therein).

vii.   The Surety must adopt and implement reasonable standards for the prompt investigation of claims arising under the Bond (and the JDE Subcontract incorporated therein).

viii.   The Surety may not refuse to pay ACS's claim under the Bond (and the JDE Subcontract incorporated therein) without conducting a reasonable investigation based upon all available information.

ix.   The Surety may not compel ACS to institute litigation to recover amounts due under the Bond (and the JDE Subcontract incorporated therein) by offering substantially less than the amounts ultimately recovered in actions brought by ACS.

x.   The Surety must promptly provide a reasonable explanation of the basis in the Bond (and the JDE Subcontract incorporated therein) in relation to the facts or applicable law for denial of any aspect of ACS's claim.

xi.   The Surety may not give greater consideration to its own interests—or the interests of JDE—than it does to the interests of ACS.

xii.   The Surety may not "lowball" or delay ACS's claim under the Bond (and the JDE Subcontract incorporated therein) in the hopes that ACS will settle for less.

xiii.   The Surety should tender to ACS the amount of benefits due under the Bond (and the JDE Subcontract incorporated therein) that are undisputed (i.e., the amount that the Surety agrees should be paid).

xiv.   The Surety should compensate ACS for financial losses—including interest on benefits—caused by the Surety's unreasonable delay in investigating and evaluating ACS's claim.

29.   These principles, together with the language of the controlling documents—

specifically, the Bond (and the JDE Subcontract incorporated therein)—establish the background

against which the Surety's refusal to fund portions of ACS's claim under the Bond must be judged.

**JDE defaulted, triggering the Surety's obligations under the Bond.**

30.     In late August 2017, JDE defaulted on its obligations under the JDE Subcontract.

31.     ACS gave Westchester notice of the default and demanded that Westchester perform pursuant to the terms of the Bond.

32.     With Westchester's knowledge and approval, ACS retained Precision Service Electric, Inc. ("PSE") to complete JDE's Work under the JDE Subcontract.

33.     Also with Westchester's knowledge and approval—and as permitted by the JDE Subcontract and the Bond—ACS supplemented the work of both JDE and PSE with ACS's own labor and materials.

34.     ACS retained PSE and supplemented the Work with its own labor and materials in an effort to mitigate the damages and delay caused by JDE's default under the JDE Subcontract and to reduce ACS's exposure to additional general conditions costs as well as liquidated damages to which ACS was exposed pursuant to its contract with the owner of the Project.

35.     As PSE and ACS worked to complete the Work required under JDE's Subcontract, they discovered that significant portions of the Work JDE had already performed was non-compliant and defective.  For example, JDE installed the wrong type of wiring in the first floor of the building, forcing ACS and PSE to incur considerable cost and delay to rectify the issue.  JDE had also missed many milestones on the Project.

36.     JDE's delays and deficient construction placed ACS and PSE in a position where they were: (a) unable to accurately understand and estimate the time to completion of JDE's scope of work, particularly in the time period immediately following JDE's default; and, (b) were working with a constantly evolving schedule due to, and in an effort to minimize and mitigate, the effects of JDE's default, delays and deficiencies.

37.     ACS communicated with Westchester throughout its efforts to mitigate the damages arising from JDE's default.

38.     Initially, Westchester attempted to buy out its liability to ACS under the Bond. Such buyout discussions were unsuccessful because of the substantial uncertainty of both cost and schedule caused by JDE's deficient and untimely work.

39.     Eventually, it was agreed that ACS and PSE would continue to supplement and perform JDE's Work under the JDE Subcontract and that ACS would bill Westchester monthly for its costs and fees incurred in connection with the same.

**Westchester regularly fails and refuses to pay the amounts invoiced by ACS pursuant to the Bond.**

40.     ACS sent Westchester invoices on a regular basis between October 2017 and January 2017.

41.     Westchester regularly denied substantial portions of the invoices submitted by ACS.

42.     Between October 2017 and January 2017, ACS engaged in numerous discussions with representatives of Westchester in an effort to obtain payment under the Bond.  During this time frame, ACS provided a large amount of additional supporting documents (despite the fact that Westchester's requests for such had little or no basis in the Bond or the JDE Subcontract).

**ACS's final invoice and Westchester's unreasonable delay and denial of payment of the same.**

43.     By January of 2018, ACS had completed the Project to the point where it could evaluate the full impact of JDE's default and the damages ACS had suffered in connection with the same.

44.     ACS submitted its final invoice for JDE's scope of Work to Westchester for payment on or about January 16, 2017.

45.     Westchester responded to ACS's final invoices via letter from its counsel—Patrick Hustead, of the Hustead Law Firm ("Hustead")—dated February 22, 2018.  Enclosed with Hustead's February 22, 2018 letter was a February 13, 2018 report prepared by the Vertex Companies, Inc. ("Vertex").  The February 22, 2018 Hustead letter and enclosed February 13, 2018 Vertex report shall be collectively referred to herein as the "Initial Denial."

46.     The Initial Denial refused to fund over $381,000 of ACS's claim under the Bond.

47.     Westchester's Initial Denial was improper and violated the terms of the Bond, the JDE Subcontract incorporated therein, and controlling Colorado law.  For example, and without limitation, Westchester:

i.      Failed to provide an adequate explanation of the basis in the Bond, the JDE Subcontract, or controlling law for its denial of various charges within ACS's invoices.  In some cases, Westchester denied payment with no explanation at all.

ii.     Asserted that the penal sum of the Bond remained at the original stated value of the JDE Subcontract despite the fact that the terms of the Bond (and the JDE Subcontract incorporated therein) had required Westchester to increase the penal sum commensurate with changes in JDE's scope of work.

iii.    Denied payment for various common job materials (such as wiring, switches and plugs) because the quantities reflected in PSE's invoices did not exactly match the quantities they installed or ACS was unable to produce an underlying materials receipt.  Westchester ignored the facts that: (a) such common materials are

routinely stocked by electrical subcontractors; (b) nothing in the Bond, JDE Subcontract, or PSE's contract with ACS required PSE or ACS to provide underlying materials invoices for all material installed at the Project; and, (c) there was no evidence that PSE or ACS was billing for materials that were not actually installed at the Project. Effectively, Westchester tried to manufacture a bookkeeping issue having no support in the Bond or the JDE Subcontract instead of basing its decision on whether the materials invoiced by PSE were required to complete the Project.

iv.   Denied payment of overhead and markups specifically allowed by the terms of ACS's contract with PSE.

v.    Refused to pay for tools, gas, travel time, tolls and parking charges despite the fact that such items were expressly covered by the Bond and the JDE Subcontract incorporated therein.

vi.   Offset ACS's claim on the Bond by the full value of the JDE Subcontract, inclusive of all change orders, then denied payment for change order work.

vii.  Refused to pay for the delay analysis performed by ACS's schedule analyst, despite the fact that such costs were covered by the Bond and the JDE Subcontract incorporated therein.

viii. Improperly conflated ACS's supplemental labor, additional general conditions costs, and the liquidated damages imposed on ACS by the Project Owner, resulting in Westchester's failure to pay ACS for delays even Westchester admitted existed due to JDE's actions.

ix.   Attempted to impose upon PSE delays that were clearly the consequence of JDE's default.

48.   As a result of the Initial Denial, ACS's counsel sent Westchester a 30-page letter dated April 5, 2018 wherein ACS exhaustively detailed the many legal and factual flaws in the Initial Denial. A copy of ACS's April 5, 2018 correspondence (the "ACS Request for Reconsideration") is attached hereto as Exhibit 2.

49.   Westchester "responded" to the ACS Request for Reconsideration on or about May 7, 2018 (the "Westchester Response").

50.     The Westchester Response failed to remedy the conduct demonstrated by the Initial Denial.  In many cases, it merely exacerbated Westchester's earlier conduct.  For example:

a.   Westchester advanced just under $25,000 in additional funds in connection with the Westchester Response.  But it changed the format of the enclosed report from Vertex such that ACS was unable to ascertain what charges that were initially denied were now being paid.   ACS was similarly unable to ascertain why Westchester had changed its mind on those unidentified charges.

b.   Westchester continued its refusal to explain the basis in the Bond, JDE Subcontract and/or controlling law for its denial of payments that ACS: (i) contended were covered; and, (ii) with respect to which ACS specifically asked Westchester to clarify the basis for its position.

c.   Westchester failed to address each of the very detailed defects set forth in the ACS Request for Reconsideration and, instead, responded in a fashion that failed to adequately explain the basis for Westchester's denial (despite the lack of such explanation being a central allegation of improper conduct in the ACS Request for Reconsideration).

d.   Westchester stood on its denial of the overwhelming majority of expenses addressed in the ACS Request for Reconsideration without setting forth an adequate basis in the Bond, the JDE Subcontract or controlling law for its failure to pay the same.

**Westchester's conduct is part of a pattern and practice.**

51.     This is not the first time ACS has been involved in a bond claim where Hustead and Vertex have acted as the defacto adjuster of a claim.

52.     Each case in which ACS has had a bond claim handled by Hustead and Vertex follows a similar playbook:

   a.  Hustead and Vertex contest charges actually expended and incurred by ACS to complete work of a defaulting contractor covered by a performance bond without adequate explanation or basis in the terms of the bond itself.

   b.  Hustead and Vertex cause the bond insurer to fail and refuse to make payments covered by the terms of the bond;

   c.  Hustead and Vertex attempt to leverage the expense and hassle of litigation to cause the beneficiary of the performance bond to accept less than they are owed pursuant to the terms of the bond in question.

53.     Upon information and belief, and based on ACS's conversations with others in the industry, the playbook utilized by Hustead and Vertex is not specific to ACS.  Instead, the Hustead/Vertex playbook is one that is regularly utilized by Hustead/Vertex when acting as defacto adjuster for their insurance company clients on bond claims in an effort to cause the bond claims to settle for less than the amount owed pursuant to the terms of the bond in question.

54.     The impact of the Hustead/Vertex playbook on meritorious claims such as this one—where the cost of completion well exceeded the penal sum of the Bond—is more pronounced because Hustead/Vertex, acting as defacto paid third-party adjusters, have a built-in desire and incentive—whether conscious or unconscious—to adjust a claim in a manner that

justifies their own charges associated with the same and ensures their continued retention on similar matters going forward.

## FIRST CLAIM FOR RELIEF
### (For Declaratory Judgment)

55.     ACS incorporates herein all averments set forth in the paragraphs above.

56.     The parties are interested persons whose rights are affected by the Bond.

57.     Certain disputes and uncertainties have arisen concerning the rights and obligations of ACS and Westchester under the Bond including, without limitation, the correct penal sum of the Bond and whether certain expenses such as tools, gas, travel time, parking, tolls, certain PSE profit and overhead charges and expenses incurred by ACS as the direct result of the positions taken by Westchester are covered under the terms of the Bond (and the JDE Subcontract incorporated therein).

58.     Pursuant to 28 U.S.C. § 2201, the parties are entitled to a judicial declaration of their respective rights, obligations and duties under the Bond.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

59.     ACS incorporates herein all averments set forth in the paragraphs above.

60.     ACS is the obligee and beneficiary of the Bond and the JDE Subcontract incorporated therein.

61.     ACS has incurred substantial costs and expenses as a direct and proximate result of JDE's default under the JDE Subcontract.

62.     Westchester has failed and refused to pay to ACS all of those costs and expenses covered under the Bond despite ACS's demand for the same.  Such failure has deprived ACS of

the full amount of the covered benefit under the Bond and has caused ACS to incur, and become subject to incurring, significant additional and consequential resulting damages (inclusive of costs and attorneys fees resulting from JDE's default which are covered under the Bond by virtue of the JDE Subcontract incorporated therein).

63.     As a result of Westchester's failure and refusal to honor the full extent of its obligations under the Bond, ACS has been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Violation of Prompt Payment Statute, C.R.S. §§ 10-3-1115 and 1116)**

64.     ACS incorporates herein all averments set forth in the paragraphs above.

65.     ACS, as obligee and beneficiary of the Bond, is a "First-party claimant" as that term is defined in C.R.S. § 10-3-1115.

66.     Westchester has unreasonably delayed and/or denied payment due ACS under the terms of the Bond (and the JDE Subcontract incorporated therein by reference).

67.     Westchester's failure and refusal to fund the full amount of its obligations under the Bond is unreasonable and in bad faith because, without limitation, Westchester has acted in violation of the terms of the Bond, the terms of the JDE Subcontract incorporated therein by reference, and controlling law, all as detailed above and in Exhibit 2 hereto.

68.     As a result of Westchester's unreasonable failure to pay to ACS all sums due and owing pursuant to the Bond (and the JDE Subcontract incorporated therein by reference), ACS has been damaged in the amount of the covered benefit that should have been paid had Westchester honored its obligations under the Bond.  Such amount shall be determined at trial.

69.     In addition to other remedies available at law or in equity, and in addition to the amount of the covered benefit under the Bond itself, ACS is entitled to recover from Westchester

an amount equal to twice the covered benefit ACS was entitled to under the Bond, together with

ACS's reasonable attorney's fees and interest as allowed by law.

## FOURTH CLAIM FOR RELIEF
### (Common Law Bad Faith Breach of Insurance Contract)

70.     ACS incorporates herein all averments set forth in the paragraphs above.

71.     Westchester acted unreasonably in denying payment of large portions of ACS's

claim under the Bond (and the JDE Subcontract incorporated therein).

72.     Westchester knew that, and/or recklessly disregarded the fact that, its conduct and

position were unreasonable because the ACS Request for Reconsideration set forth in detail the

defects in Westchester's denial of payment and Westchester overwhelmingly elected to stand on

its denial in the face of such known defects.

73.     Westchester's failure to pay to ACS the full amount of ACS's claim as covered

under the terms of the Bond (and the JDE Subcontract incorporated therein by reference) has

caused ACS to suffer substantial damages and losses in excess of the amount of the covered

benefit due and payable to ACS under the Bond.

74.     ACS has suffered significant damages and losses caused by Westchester's denial

of sums due under the Bond in an amount to be determined at trial.

75.     Westchester knew that its conduct was in violation of the Bond as interpreted and

applied under controlling law and that its denial exposed ACS to significant damages over and

above the amount of the covered loss under the Bond.  Yet Westchester stood on the denial

without regard to the deficiencies in its own conduct and the rights of ACS under the Bond.

Westchester's conduct—evidenced not just in this case but by the pattern and practice of

Hustead/Vertex when acting as defacto adjusters on similar bond claims—amounts to a willful,

wanton and reckless disregard for the rights of the ACS (and controlling law).  As such, ACS is entitled to recover punitive damages from Westchester in addition to: (a) the covered benefit payable under the Bond; and, (b) the consequential damages caused by Westchester's wrongful denial of payment to ACS under the Bond.

## PRAYER FOR RELIEF

WHEREFORE, ACS prays for judgment against Westchester as follows:

1.     Declaring that the various categories of expenses denied by Westchester are covered under the Bond (and the JDE Subcontract incorporated therein by reference) and that Westchester must pay the same;

2.     Awarding judgment in ACS's favor and against Westchester in the amount of:

a.     The covered benefit due and payable under the Bond;

b.     An additional sum equal to twice the covered benefit payable under the Bond as required by the Prompt Payment Statute (C.R.S. §§ 10-3-1115 and 10-3-1116) or such punitive damages as a jury may award under ACS's Fourth Claim for Relief, whichever amount is greater;

c.     The consequential damages suffered by ACS as a result of Westchester's wrongful denial;

d.     ACS's costs and attorney's fees incurred in connection with this proceeding;

e.     Interest as permitted by law.

3.      For such further and additional relief as the Court deems necessary and/or proper.

**ACS DEMAND THAT THIS ACTION BE TRIED TO A JURY.**

Respectfully submitted this 18th day of June, 2018.

_s/ Scott W. Wilkinson_
Scott W. Wilkinson, No. 36622
Michael P. Murray, No. 44220
Davis & Ceriani, P.C.
1600 Stout Street, Suite 1710
Denver, CO 80202
Tel:     (303) 534-9000
Fax:  (303) 534-4618
Email:  swilkinson@davisandceriani.com
            mmurray@davisandceriani.com
*Attorneys for Defendants*